Leslie M. Lockhart v. Commissioner. Jeanne B. Lockhart v. Commissioner.
Lockhart v. Commissioner
Docket Nos. 108612, 108613.
United States Tax Court
1943 Tax Ct. Memo LEXIS 364; 1 T.C.M. (CCH) 908; T.C.M. (RIA) 43174; April 13, 1943
*364 Robert Ash, Esq., Munsey Bldg., Washington, D.C., and Frank G. Rodgers, C.P.A., Alamo Nat'l. Bldg., San Antonio, Tex., for petitioners. Donald P. Moyers, Esq., for respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: These are consolidated proceedings for the redetermination of deficiencies in income tax as follows: Docket
Amount of
No.
Year
Petitioner
Deficiency
108612
1939
Leslie M. Lockhart
$186,203.21
108613
1939
Jeanne B. Lockhart
702.82
The issues are (1) whether respondent erred in increasing income because of profits from the disposition of installment obligations, and (2) in the alternative, if it should be held that petitioners realized such profits, whether respondent erred in his method of computing taxes on the transactions. The facts were stipulated in part and established in part by oral and documentary evidence. Findings of Fact Petitioners are individuals, with addresses at 942 Milam Building, San Antonio, Texas. Each filed a separate income tax return for the taxable year 1939 with the collector of internal revenue for the first district of Texas. Petitioners are husband and wife, but their separate returns were not *365 filed on a community property basis, since they were married on December 22, of the taxable year. At March 1, 1937, the Invincible Oil Company, a Delaware corporation, with a permit to do business in the State of Texas, had an authorized capital stock consisting of 50,000 shares of common stock of no par value, of which there were issued and outstanding 28,797 shares in the names of the following individuals: L. M. Lockhart
24,632 shares
L. E. Lockhart
3,865 shares
Dan W. Francis
300 shares
Of the remainder of the authorized capital stock, 400 shares were treasury stock, and the balance unissued. Of the 24,632 shares standing in the name of petitioner Leslie M. Lockhart, he was the actual owner of 22,732 shares, and petitioner Jeanne B. Lockhart was the actual owner of 500 shares. The Invincible Oil Company hereinafter referred to as Invincible, was the owner of valuable oil leases in the East Texas field, on which there were 41 producing wells as of March 1, 1937. Prior to March 1, 1937, a corporation known as the American Liberty Oil Company, of Dallas, Texas, hereinafter called American Liberty, through its officers entered into negotiations with the stockholders *366 of Invincible for the purchase of their stock. These negotiations culminated in a contract dated March 1, 1937, between the stockholders of record of Invincible as "sellers" and American Liberty as "buyer", which agreement in so far as material here is quoted in part and summarized in part as follows: 5. Each Seller has this day severally bargained, sold and endorsed for transfer to Buyer all shares of stock owned by such Seller in Invincible Oil Company and has delivered such shares and certificates representing such shares to Collateral Depository hereinafter named, and hereby each Seller does sell, assign and deliver unto Buyer all of such Seller's right in and to the authorized but unissued stock of Invincible Oil Company and vests in Buyer all of such Seller's rights to subscribe therefor subject to the lien and pledge hereinafter referred to. In reliance on the representations of Sellers hereinabove made, Buyer has purchased each such lot of shares, and promises to pay for same as hereinafter set out. * * * Each Seller has reserved and does hereby reserve a lien upon the shares and rights herein referred to, to secure the performance of this agreement and the payments to be *367 made hereunder; * * * The entire consideration, subject to certain limitations set out in the agreement, which the buyer agreed to pay and the sellers agreed to accept for all outstanding shares of the capital stock of Invincible and for subscription rights to the unissued shares, was $2,783,389.76, whereof $250,000 was paid in cash and $2,533,389.76 was evidenced by 832 purchase money notes. For the 300 shares of stock of Invincible sold by Dan W. Francis, and for his subscription rights, the buyer paid in cash the sum of $25,532.90. In full payment of the 24,632 shares of Invincible stock sold by petitioner Leslie M. Lockhart, and the subscription rights pertaining thereto, the buyer made an initial cash payment and executed purchase money notes designated Series A, B, C, D and E for the balance. The amounts of cash and notes received by Leslie M. Lockhart for the shares actually owned by him at the date of the contract were as follows: Cash $118,389.05, serial notes $2,130,067.78, total $2,248,456.83. The 22,732 shares of stock actually owned by this petitioner had, for purposes of these proceedings, a total cost basis of $174,397.41, and had been acquired more than two years *368 prior to March 1, 1937. The amounts of cash and notes received by Jeanne B. Lockhart for the 500 shares of stock of Invincible owned by her, but which stood in the name of Leslie M. Lockhart at March 1, 1937, were as follows: Cash $4,340.75, serial notes $43,987, total $48,327.75. The total cost basis of these 500 shares to this petitioner was $2,785.40, and had been acquired by her or her donor more than two years prior to March 1, 1937. Under the contract of March 1, 1937, the notes designated Series A to E, inclusive, were, each, for a stated principal amount, with interest at the rate of 10 percent per annum, and matured substantially in numerical monthly succession. The contract further recited that the buyer was purchasing the certificates of stock of Invincible subject to certain indebtedness which the buyer had agreed to cause Invincible to pay, and that unless and until the buyer should exercise the option provided for thereafter in the contract, there should be paid by the buyer to the sellers each month an amount equal to (a) the entire amount of the notes of Series A to H, inclusive, currently due in each month, or (b) an amount equal to the value at the prevailing *369 market price at the wells of three-fourths of the total interest of Invincible in the total production of oil and gas during the preceding calendar month, whichever was greater. The buyer agreed that, within 180 days from the date of the contract it would secure to sellers the payment of the 832 notes in Series A to H, inclusive, (a) by obligations of the United States Government or other approved securities, or (b) by the execution of a deed of trust on all properties owned by Invincible. When and if such other collateral had been furnished, the sellers agreed to release the shares of Invincible stock held by them as collateral, and buyer was given the right thereupon to dissolve Invincible or to merge or consolidate it with another corporation. The buyer was given the option, before referred to, at any time while not in default under the contract, to assign and convey to petitioner Leslie M. Lockhart, free of encumbrance, the 24,632 shares of stock contracted to be sold by him, or in the event that Invincible had been dissolved or merged prior to the exercise of such option, then to assign and convey to Lockhart as trustee for all of the holders of notes of Series A to E, inclusive, *370 then remaining unpaid, an undivided 24,632/28,797 interest in all property owned by Invincible at the date of the contract, in full satisfaction and discharge of the aggregate amount remaining unpaid on such series of notes. It was further agreed in the contract that if the buyer should exercise the option above mentioned and convey to Leslie M. Lockhart either the stock or the fractional interest in the properties as provided, nevertheless the buyer should have the exclusive right and privilege as a covenant running with the leasehold estates, upon 30 days' notice, to purchase at the average posted price the proportionate interest of Lockhart, or his assignees, in all oil produced for a period of 10 years from March 1, 1937. Of the series of notes described in the above contract, Series A were the notes given to petitioner Leslie M. Lockhart in part consideration for the 22,732 shares of Invincible stock actually owned by him and the series D notes were given to petitioner Jeanne B. Lockhart in part consideration for the 500 shares owned by her but standing in the name of Leslie M. Lockhart. American Liberty elected to exercise its option to put up collateral pursuant to the terms *371 of the contract, in lieu of the lien on the stock of Invincible, and for that purpose executed a deed of trust to the oil properties to secure the notes above mentioned. Thereafter, during the year 1937, Invincible was dissolved. The outstanding indebtedness of Invincible at March 1, 1937, was $181,485.73, and these liabilities were finally discharged in January 1938, after which date payments were applied on the Series A notes of petitioner Leslie M. Lockhart. Petitioners did not report as their income any proceeds of production from the oil properties, and never at any time claimed any allowance for depletion on the proceeds from production or on the payments received from American Liberty. Petitioners applied all such payments on the outstanding notes of American Liberty regardless of the basis for computing the payments, that is, three-fourths of production or face of notes due in each calendar month. In 1939 the price of crude oil in the East Texas field dropped from $1.35 per barrel, the price prevailing in 1937 and 1938, to $1.10 per barrel, and proration restrictions on production further reduced the amounts received by American Liberty from the properties described in the *372 contract. Because of these factors, American Liberty elected on September 1, 1939, to exercise the option granted in the contract of March 1, 1937, and pursuant thereto, conveyed to Leslie M. Lockhart a 24,632/28,797 interest in all of the properties involved. Of the interest so conveyed, this petitioner actually owned a 22,732/28,797 interest, and petitioner Jeanne B. Lockhart owned a 500/28,797 interest. In exchange for such interest, all of the outstanding notes of Series A to E, inclusive, were returned by their holders to American Liberty. On September 1, 1939, the face amount of the serial notes outstanding and held by petitioner Leslie M. Lockhart was $1,836,424.77, and on the same date the fair market value of the property received by this petitioner from American Liberty for such serial notes was $1,249,926.58 computed as follows: Equipment on leases
$ 136,564.09
Leaseholds
941,344.93
Cancellation of a note owed
by petitioner to American
Liberty Oil Company
172,017.56
Total
$1,249,926.58
The unabsorbed cost of Leslie M. Lockhart's stock as of September 1, 1939, was the amount of $142,438.47. On September 1, 1939, the face amount of the serial notes outstanding *373 and held by petitioner Jeanne B. Lockhart was $35,203, and on the same date the fair market value of the property received by this petitioner from American Liberty for such serial notes was $23,700.38, computed as follows: Equipment on leases
$ 3,003.79
Leaseholds
20,696.59
Total
$23,700.38
The unabsorbed cost of Jeanne B. Lockhart's stock as of September 1, 1939, was the amount of $2,028.94. In her income tax return for the year 1937, petitioner Jeanne B. Lockhart (then Mrs. Jeanne Borlini Brown) reported the sale of her Invincible stock on the installment basis by computing the percentage of taxable profit in the cash and collections on notes as received, and as limited to the sale of capital assets held over five years. The same method was followed in her income tax returns for the years 1938 and 1939, with respect to collections on the notes. In a footnote to a schedule attached to her return for 1939, showing computation of income on collections up to September 1, 1939, this petitioner stated: Taxpayer has included in this return as capital gain on sale made in prior year the amounts received on notes receivable from such sale, to Sept. 1, 1939. At that date certain *374 fractional interests in producing leases in East Texas were transferred to taxpayer and oil runs therefrom after September 1, 1939 are included in this return. It is considered that such transfer as of Sept. 1, 1939 constituted a reinstatement of taxpayer's prior position, and that it should be non-taxable. Petitioner Leslie M. Lockhart filed an individual income tax return for the calendar year 1937, executed on March 10, 1938, to which was attached a "Statement of Income and Deduction." This schedule showed "Amount Received on Sale of Invincible Oil Co. Stock - $120,219.98," and other items added thereto which made a total gross income of $126,998.51, from which were deducted items in the aggregate amount of $151,180.26, leaving a net loss for 1937 of $24,181.75, and no tax due. A statement attached to this return reads as follows: NOTE: - As the cost of the above stock has not been determined at this time, no attempt has been made to calculate the profit as the return is non-taxable using 100% of the receipts during 1937 as income. The cost of the stock will be determined during 1938. The profit from the sale on the amount received during 1936 [1937] will not be taxable in *375 full as different blocks of the stock have been held from less than one year to over five years and this factor will be taken into consideration in determining the taxable income for this and subsequent years. In his income tax return for 1938, petitioner Leslie M. Lockhart reported the sale of his Invincible stock on the installment basis by computing the percentage of taxable profit in the collections on notes received in that year, and as limited to the sale of a capital asset held for more than 24 months. The same method was employed in reporting taxable profits in the collections received in 1939, up to September 1 of that year. Opinion The first issue raised by the pleadings in this case is whether petitioners realized taxable gain in 1939 from the disposition of installment obligations, when they received certain fractional interests in oil producing properties, pursuant to provisions of the contract of March 1, 1937, in exchange for the outstanding promissory notes of American Liberty Oil Company, held by them. The first contention of petitioners is that there was no sale under the contract in 1937, substantially for the reason that there was no "valid inforceable *376 consideration of a definite amount." The authorities cited by petitioners on this point are not opposite; in each case the decision was predicated upon readily distinguishable facts. While we entirely agree with the rules enunciated in the cited cases, application of such rules to the question presented here must be determined on the basis of the particular facts disclosed in the record before us. What, then, are the facts shown in the record in respect of (1) the subject matter of the contract, (2) the respective obligations of the parties thereunder, and (3) the nature of the consideration recited? In order to avoid possibility of confusion, it is necessary first to determine clearly and definitely what was the subject-matter of the contract. Petitioners seem to take the view it was oil properties or interests in oil properties, evidenced by shares of corporate stock. The first sentence of petitioners' argument on brief states: "It is obvious that the petitioners herein made no sale of oil properties in 1937." With this premise we agree, although not for the assigned reason that it was lack of valid consideration. The subject-matter of the contract was the shares of capital stock *377 of Invincible Oil Company, not the properties or assets of the company. The parties to the contract were the stockholders of record of Invincible, referred to as the "sellers," and American Liberty, referred to as the "buyer." The contract recited that each seller had "severally bargained, sold and endorsed for transfer to Buyer" all shares of such stock owned by such seller, and that the buyer had purchased each lot of shares and promised to pay for the same as thereinafter set out. Petitioners further argue that, notwithstanding the contract was in effect denominated a contract of purchase and sale and at the time may have been treated by the parties as such, tax consequences must be determined on the basis of its true nature, according to its terms and provisions. With this contention we also agree. Even though it was called a contract of purchase and sale, it was not in fact such if there was no definitely stated valid consideration, or if it amounted to no more than an option to purchase by reason of investing in the "buyer" a right to rescind. Parish-Watson & Co. Inc., 4 B.T.A. 605. The contract did give the buyer two separate and distinct options, *378 exercisable at any time while not in default, by which payment of the outstanding serial notes in cash could be avoided. The first option vested in the buyer the right to assign and convey to petitioner Leslie M. Lockhart the 24,632 shares of Invincible stock standing in his name at the date of the contract, in full satisfaction of the amount remaining unpaid on the serial notes held by petitioners. Whether this option amounted to a right of rescission we need not decide, since it was never exercised. The second or alternative option gave the "buyer" the right, in the event Invincible had been dissolved prior to exercise of the first option, to assign to Leslie M. Lockhart, as trustee for all of the holders of the A to E series of notes, a certain specified fractional interest in all properties owned by Invincible at the date of the contract, in full satisfaction of the unpaid notes. Invincible was dissolved in 1937 pursuant to other provisions of the agreement, and on September 1, 1939, the "buyer" elected to exercise the second option mentioned. On that date, the agreed fractional interests in the oil properties were conveyed to petitioners, and in exchange therefor, they surrendered *379 the unpaid serial notes held by them. Thus, it is apparent that the exercise of the second option was in no sense a rescission of the contract, but a discharge of the buyer's obligation thereunder, and constituted payment by the buyer of the alternative consideration agreed upon for Invincible's stock. Petitioners were not thereby returned to their prior positions, and the tax consequences flowing from the transaction must be given recognition. Similar tax results would have followed if petitioners had retained, instead of selling, their stock in Invincible in 1937, and had thereafter acquired the fractional interests in the oil producing properties in exchange for their shares of stock by liquidation of the corporation in 1939. Whatever the contract may have been at the date of its execution, we think it is clear that it had become a contract of purchase and sale of shares of corporate stock for a definite, agreed consideration prior to the close of the year 1937, by reason of the dissolution of Invincible in that year. After such dissolution, the buyer no longer had a right to return the stock in cancellation of the notes; the purchasing corporation was thereafter bound absolutely *380 to pay for the stock either in cash an amount equal to the principal of the notes, plus interest, or, at its option, a specified fractional interest in the oil properties. The fact that the buyer had the privilege under the contract of paying for the stock by an alternative method, in property of kind other than that purchased, is in our opinion not of controlling importance. The buyer contracted to pay cash for the stock according to the terms of the agreement, and it remained bound so to do unless and until it elected to discharge the unpaid balance of the notes by conveyance to the noteholders of specified interests in the oil properties. Such election was a right or privilege vested exclusively in the buyer under the provisions of the contract. Nor can it be said that the contract did not constitute an agreement of purchase and sale because of the failure of the second option to provide for a consideration ascertainable with reasonable certainty. The agreement to pay cash, definite in both amount and value, remained in effect until exercise of the alternative option. The buyer exercised the option to pay in property on September 1, 1939, and thereby substituted property payment *381 in lieu of cash, but the parties have stipulated that on that date the property exchanged for the unpaid notes had a fair market value, the equivalent of cash, in the amount stated in our findings of fact above. The fact that the value of the property was less than the face amount of the unpaid notes was merely an adjustment of the selling price of the stock, and has no material bearing on the question under discussion. Cf. Jacob Carp, 31 B.T.A. We conclude therefore, that the transaction in 1937 constituted a sale by petitioners of their Invincible stock for an adequate consideration in money or money's worth. Having determined that the transaction was a sale, the facts leave no room for doubt that it was a deferred payment sale on the installment plan, within the meaning of the taxing statute. The manner in which both of these petitioners reported the transaction in their income tax returns for 1937-1939 clearly indicates that in those years they entertained the same conclusions. So far as pertinent here, section 44 of the Internal Revenue Code, applicable to the taxable year 1939, provides that in the case of a casual sale or other disposition of personal property for a *382 price exceeding $1,000, or of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 percentum of the selling price, the income may, under prescribed regulations, be returned on the installment basis, that is, the taxpayer may return as income therefrom in any taxable year that proportion of the installment payments actually received in such year which the gross profit realized or to be realized when payment is completed, bears to the total contract price. Similar provisions are contained in section 44 of the Revenue Acts of 1936 and 1938. Petitioners were not required by the statute to return on the installment basis the profits derived from the sale of their stock; it was merely a privilege they might exercise, Max Viault, 36 B.T.A. 430, but whatever basis they selected for computing the profits derived in the year of the transaction, if such basis correctly reflected income, they could not change thereafter to another and different basis. Pacific National Co. v. Welch, 304 U.S. 191, (20 AFTR 1248). The record shows that both petitioners elected to report *383 the transaction in their 1937 returns on the installment basis, and it is not contended otherwise as to petitioner Jeanne B. Lockhart. They also computed gain in their returns for 1938 and 1939 on the same basis. In his return for 1937, the petitioner Leslie M. Lockhart reported the transaction and included in income the entire amount of cash received in that year. However, in that connection, he stated that no attempt had been made to calculate the profit, since the cost of the stock had not been determined and the return was nontaxable in any event, and he further stated that the cost of the stock would be determined during the year 1938 and taxable income for 1937 and subsequent years would be determined on the basis of the capital gains provisions of the statute. Thus, this petitioner indicated his intention to return income on the installment basis, and such basis was in fact used in reporting taxable income for 1938 and 1939. Notwithstanding the basis used in the returns referred to, petitioners now say on brief that both parties have treated the income erroneously, and urge either the one or the other of two different methods as proper for determining their tax liability. *384 First, it is argued that for each of the years involved under the contract petitioners should have returned their gains as ordinary income and taken depletion thereon, citing a number of decisions dealing with income from interests which represented capital investments in the oil and gas in place. Such decisions are not pertinent here. It is a sufficient answer to petitioners' argument to point out that under the contract of March 1, 1937, neither of them retained nor purported to retain any interest whatever in oil and gas in place. The lien given under the deed of trust to secure payment of the notes did not constitute retention of such an interest. Cf. Thomas v. Perkins, 301 U.S. 655, (19 AFTR 538). Payment of the agreed consideration, represented in part by notes held by petitioners, was in no way dependent upon production from the property. While it is true that the amount to be paid on the notes each month was measured by (1) a specified portion of the production, or (2) face amount of the notes payable in such month, whichever was greater, this did not amount to the retention of an interest, based upon a capital investment, in *385 the oil in place. Petitioners at the date of the contract had no such interest to retain; the minerals in place then belonged to Invincible. Petitioners at most had only a beneficial interest in the properties of the corporation, and this interest they parted with upon sale of their shares of stock. Petitioners' second or alternative contention on this point is predicated upon the premise (a) that their gain from the disposition of the installment obligations in 1939 should be computed on the vaule of the property interests received by them; (b) that such value was dependent upon the recovery of oil, and (c) that the realization of any profit or income was so indefinite and uncertain, it should be computed and taxed on the "return of capital basis" under the doctrine of Burnet v. Logan, 283 U.S. 404, (9 AFTR 1453). In our opinion there is no merit in this contention; the cited decision is clearly distinguishable on the facts. Petitioners' argument ignores the fact that the fractional interest in the oil properties conveyed to Leslie M. Lockhart on September 1, 1939, in exchange for his unpaid serial notes, had a fair market value of *386 $1,249,926.58, including the cancellation of a note owed by this petitioner to American Liberty in the amount of $172,017.56, which was the equivalent of cash; and that the fractional interest conveyed to petitioner Jeanne B. Lockhart had a fair market value at the same date of $23,700.38. There was no uncertainty, therefore, as to the value of the property received by petitioners for their notes. The debtor company paid its notes to petitioners in property having a value equivalent to cash. The situation in the Logan case was entirely different, as is made plain in the opinion of the court, which we quote as follows: The consideration for the sale [of corporate stock] was $2,200,000 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one. Respondent might never recoup her capital investment from payments only conditionally promised. * * * She properly demanded the return of her capital investment before assessment of any taxable profit based on *387 conjecture. We have no difficulty in concluding here that petitioners properly reported on the installment basis the income realized from the cash payments received in 1937 and the payments received on their serial notes in subsequent years to September 1, 1939. It follows that the gain derived from the disposition of the unpaid installment obligations for less than face value on the latter date must be computed in the manner prescribed by the statutes and regulations. Eggerman Investment Co., 36 B.T.A. 1196; T. Eugene Piper, 45 B.T.A. 280. Applicable in the instant case, such method is prescribed in Regulations 103, sec. 19.44-5, and sec. 44 (d) of the Internal Revenue Code, which respondent has applied in his computations. On the first issue, respondent's action is approved. The second issue raised by petitioners calls in question the correctness of the interpretation of the statute as applied by respondent under the cited regulations. The same question was considered and decided by us, contrary to petitioners' contention, in Blanche A. Lockhart, 1 T.C. 804, a related case arising *388 out of the transactions involved herein. On authority of that decision, respondent's action on the second issue is approved. It was stated at the hearing that the figures stipulated by the parties and which are set out in our findings of fact above, vary somewhat from the figures stated in the deficiency notice in the case of Leslie M. Lockhart, but that such discrepancies will be adjusted in the computations upon final settlements. Accordingly, Decisions will be entered under Rule 50.